**In re POTASH ANTITRUST LITIGATION.**

Civ. No. 3–93–197.
MDL Docket No. 981.

United States District Court,
D. Minnesota,
Third Division.

Jan. 12, 1995.

Mark Reinhardt, Reinhardt & Anderson, St. Paul, MN, Orrin S. Estebo, Estebo Schnobrich Frank & Solie, Redwood Falls, MN, Warren Rubin, Gross Sklar & Metzger, Philadelphia, PA, Michael J. Freed, Much Shelist Freed Denenberg Ament & Eiger, Chicago, IL, Joseph Goldberg, Freedman Boyd & Daniels, Albuquerque, NM, Lynn L. Sarko, Keller Rohrback, Seattle, WA, Jack Weston Hanson, Hanson & Assoc., Minneapolis, MN, Steve W. Berman, Hagens & Berman, Seattle, WA, Thomas J. Potter, Lu-

dens Potter & Burch, Morrison, IL, Pat M. Barrett, Jr., Barrett Law Office, Lexington, MS, Francis O. Scarpulla, Scarpulla Law Office, San Francisco, CA, Vernon N. Reaser, Reaser & Wall, Victoria, TX, Joel C. Meredith, Meredith & Cohen, Philadelphia, PA, Robert N. Kaplan, Kaplan & Kilsheimer, New York City, Charles R. Watkins, Susman Saunders & Buehler, Chicago, IL, Eugene A. Spector, Mark S. Goldman, Paul J. Scarlato, Spector & Roseman, Philadelphia, PA, Eric D. Freed, Freed Law Office, Los Angeles, CA, for plaintiff Blomkest Fertilizer, Inc.

Lynn L. Sarko, Seattle, WA, Charles R. Watkins, Susman Saunders & Buehler, Chicago, IL, for plaintiff Hahnaman Albrecht, Inc.

Charles Harley Johnson, Johnson & Assoc., Mark Reinhardt, Reinhardt & Anderson, St. Paul, MN, for plaintiff John Peterson dba Almelund Feed & Grain.

Elliot S. Kaplan, Linda S. Foreman, Lateesa Thamani Agunbiade, Robins Kaplan Miller & Ciresi, Minneapolis, MN, Joseph W. Cotchett, Susan Y. Illston, Mark D. Eibert, John L. Fitzgerald, Cotchett Illston & Pitre, Burlingame, CA, Arthur N. Bailey, Bailey Law Office, Jamestown, NY, Leonard B. Simon, Dennis Stewart, Milberg Weiss Bershad Secthrie & Learach, San Diego, CA, for plaintiff Laing–Gro Fertilizers, Inc.

Joseph Goldberg, Freedman Boyd & Daniels, John P. Bailey, Bailey Law Office, Bemidji, MN, James S. Bailey, Jr., Bailey Harring & Peterson, Denver, CO, for plaintiff Clearbrook AG Service, Inc., on behalf of itself and all others similarly situated.

James B. Sloan, Pedersen & Houpt, William T. Gotfryd, Gotfryd Law Office, Chicago, IL, for plaintiff Reamford Liquid Fertilizer Inc., on behalf of itself and all others similarly situated.

James B. Sloan, Pedersen & Houpt, William T. Gotfryd, Gotfryd Law Office, Chicago, IL, Eliot Norman, Thompson & McMullan, Richmond, VA, for plaintiffs Tolley's Inc., and James River Farm Service Inc., on behalf of themselves and all others similarly situated.

Patrick J. Grannan, Chimicles Burt Jacobsen & McNew, Los Angeles, CA, C. Oliver Burt, III, Mark C. Rifkin, Chimicles Burt Jacobsen & McNew, Haverford, PA, Eugene Mikolajczyk, Prongay & Mikolajczyk, Pacific Palisades, CA, for plaintiff Angela Coleman, on behalf of herself and all others similarly situated.

Joseph W. Cotchett, Mark D. Eibert, Ruth Silver Taube, Cotchett Illston & Pitre, Burlingame, CA, Arthur N. Bailey, Bailey Law Office, Jamestown, NY, for plaintiff AG Network, Inc.

Jerome B. Pederson, Fredrikson & Byron, Minneapolis, MN, Michael Evan Jaffe, Arent Fox Kintner Plotkin & Kahn, Washington, DC, George S. Cary, Irell & Manella, Newport Beach, CA, for defendant Potash Corp. of Saskatchewan, Inc.

Jerome B. Pederson, Fredrikson & Byron, Minneapolis, MN, Michael Evan Jaffe, Eugene J. Meigher, James P. Mercurio, Gerald Zingone, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for defendant Potash Corp. of Saskatchewan Sales, Ltd.

Leon R. Goodrich, Oppenheimer Wolff & Donnelly, St. Paul, MN, Victor S. Friedman, Fried Frank Harris Shriver & Jacobson, New York City, Stephen D. Alexander, Fried Frank Harris Shriver & Jacobson, Los Angeles, CA, for defendant Potash Co. of America, Inc.

Gordon Gene Busdicker, John Dwyer French, Faegre & Benson, Minneapolis, MN, Richard J. Favretto, Marc Gary, Kerry Lynn Edwards, Lawrence S. Robbins, Mayer Brown & Platt, Washington, DC, for defendant IMC Fertilizer Group, Inc.

Charles H. Critchlow, Coudert Bros., New York City, Roger B. Harris, Julie Ann Swanson, Altheimer & Gray, Chicago, IL, Douglas E. Rosenthal, Amy L. Bess, Sonnenschein Nath & Rosenthal, Washington, DC, for defendant Kalium Chemicals Ltd.

Charles H. Critchlow, Coudert Bros., New York City, Douglas E. Rosenthal, Amy L. Bess, Sonnenschein Nath & Rosenthal, Washington, DC, for defendant Kalium Canada, Ltd.

Bradley Grayson Clary, Oppenheimer Wolff & Donnelly, St. Paul, MN, David C. Gustman, William C. Holmes, Freeborn &

Peters, Chicago, IL, for defendant Noranda Minerals Inc.

Leon R. Goodrich, Oppenheimer Wolff & Donnelly, St. Paul, MN, David C. Gustman, Freeborn & Peters, Chicago, IL, for defendants Cent. Canada Potash Co., Noranda Sales Corp., Ltd.

Gerald A. Connell, Baker & Hostetler, Washington, DC, Ralph Zarefsky, Baker & Hostetler, Los Angeles, CA, for defendants Cominco, Ltd., Cominco American Inc.

Carol Alice Peterson, Dorsey & Whitney, Minneapolis, MN, Wayne A. Cross, Erin L. Ringham, Dewey Ballantine, New York City, Mark Crane, Hopkins & Sutter, Chicago, IL, Stephen A. Marshall, Rubin Baum Levin Constant & Friedman, New York City, for defendant Mississippi Chemical Corp.

Carol Alice Peterson, Dorsey & Whitney, Minneapolis, MN, Stephen A. Marshall, Martin P. Michael, Rubin Baum Levin Constant & Friedman, New York City, for defendant Eddy Potash, Inc.

Carol Alice Peterson, Dorsey & Whitney, Minneapolis, MN, Wayne A. Cross, and Stephen A. Marshall, Martin P. Michael, Rubin Baum Levin Constant & Friedman, Robert Shelley Draper, O'Melveny & Myers, Los Angeles, CA, for defendant New Mexico Potash Corp.

Victor S. Friedman, Fried Frank Harris Shriver & Jacobson, New York City, for defendant Rio Algom, Ltd.

Scott Kimrey Goldsmith, Frank Alan Taylor, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, for defendants PPG Canada Ltd., PPG Industries, Inc.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### I. Introduction

This matter is before the Court on Plaintiffs' Motion for Class Certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs, fertilizer producers in the United States, allege that beginning in April 1987, Defendant potash [1] producers violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by combining and conspiring to raise, fix, maintain, and stabilize the wholesale price of potash; and that as a result of such acts, they and members of the class they seek to represent have been injured by paying an artificially high price for potash. Plaintiffs bring this action seeking treble damages, costs, attorneys fees and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

### II. Background

The factual background of this litigation is set out in this Court's December 8, 1993 Memorandum Opinion and Order.[2] For the purposes of this Motion, however, a brief factual review is appropriate.

This litigation presently consists of twelve individual lawsuits consolidated and transferred to this Court on August 19, 1993, by the Judicial Panel on Multidistrict Litigation.

The named Plaintiffs, on behalf of themselves and the class they seek to represent, are as follows: John Peterson d/b/a Almelund Feed & Grain, a sole proprietorship with its principal place of business in Almelund, Minnesota; Hahnaman Albrecht, Inc.,

---

1. "Potash," a mineral typically mined from land deposits, is widely used in the United States, primarily for agricultural purposes. It is one of the three basic raw materials (along with phosphorous and nitrogen) used for fertilizer production. The predominant form of potash is "muriate of potash," also known as "potassium chloride." Muriate of potash is available in three different particle sizes—standard, coarse, and granular. Additional forms of potash include sulfate of potash, manure salts, soluble and chemical grades of muriate of potash, and sulfate of potash-magnesium. Muriate of potash constitutes nearly all of the potash consumed in the United States.

2. That Memorandum Opinion and Order related to Defendants' Joint Motion to Disqualify Plaintiffs' Counsel and Dismiss Their Complaints. The Court granted that Motion. The Plaintiffs subsequently filed another Complaint (Plaintiffs' Third Amended and Consolidated Class Action Complaint, (hereinafter "TAC"), Doc. No. 249) on July 8, 1994. Defendants moved to dismiss Plaintiffs' TAC October 24, 1994. The Court denied that Motion. (See Order dated November 7, 1994, Doc. No. 342.) The Plaintiffs' TAC is the basis of the present action.

an Illinois corporation with its principal place of business in Dixon, Illinois; James River Farm Service, Inc., a Virginia corporation with its principal place of business in Cartersville (Cumberland County), Virginia; AG Network, Inc., a New York corporation with its principal place of business in LeRoy, New York; and Laing–Gro, Inc., a New York corporation with its principal place of business in Eden, New York. The named Plaintiffs purchased potash between April 1987 and July 8, 1994.

The Defendants are engaged in the production and sale of potash. The Defendants [3] named in this case are: Potash Corporation of Saskatchewan, Inc. ("PCS Inc."), a Saskatchewan corporation with its principal place of business in Saskatoon, Saskatchewan, Canada; [4] Potash Corporation of Saskatchewan Sales Limited ("PCS Sales"), a Saskatchewan corporation with its principal place of business in Arlington Heights, Illinois; [5] Potash Company of America, Inc., a Canadian corporation with its principal place of business in Darien, Connecticut; IMC Fertilizer Group, Inc., a Delaware corporation with its principal place of business in Northbrook, Illinois; Rio Algom, Limited, an Ontario corporation with its principal place of business in Toronto, Canada; PPG Canada Limited, a Canadian corporation with its principal place of business in Toronto, Canada; PPG Industries, Inc., a Pennsylvania corporation with its headquarters in Pittsburgh, Pennsylvania; Kalium Chemicals, Ltd., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois; Kalium Canada, Ltd., a Canadian corporation with its principal place of business in Regina, Saskatchewan, Canada; No-

randa Minerals Inc., an Ontario corporation with its principal place of business in Toronto, Canada; Central Canada Potash Company, Limited [6] ("Central Potash"); Noranda Sales Corporation, Ltd., an Ontario corporation with its principal place of business in Toronto, Canada; Cominco, Ltd., a British Columbia corporation with its principal place of business in Vancouver, British Columbia, Canada; Cominco American Incorporated, a Washington corporation with its principal place of business in Spokane, Washington; Eddy Potash, Inc., a Delaware corporation with its principal place of business in Carlsbad, New Mexico; and New Mexico Potash Corporation, a New Mexico corporation with its principal place in Hobbs, New Mexico.

Although discussed in greater detail in the Court's December 8, 1993 Memorandum Opinion and Order, the substance of Plaintiffs' allegations consists of the following. Plaintiffs contend that beginning at least as early as April 1987, and continuing through the filing of Plaintiffs' TAC on July 8, 1994, the Defendants conspired and engaged in a concert of action to fix, stabilize, and maintain potash prices. Plaintiffs further allege that as a result of such agreement and action, price competition in the sale of potash among Defendants and their co-conspirators has been restrained; prices for potash sold by the Defendants and their co-conspirators have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and purchasers of potash from the Defendants and their co-conspirators have been deprived the benefit of free and open competition. (TAC ¶ 55.)

---

3. For the purposes of the present Motion, the Court will presume that Plaintiffs' allegations relating to the named Defendants' corporate organizations are accurate. (*See* TAC ¶¶ 9–30.)

4. In November 1989, it acquired all the assets and liabilities of Potash Corporation of Saskatchewan ("Crown PCS"). At all relevant times, PCS, Inc. and Crown PCS were engaged in the business of producing and selling potash. (TAC ¶ 9.)

5. PCS Sales is a wholly-owned subsidiary of PCS, Inc.; at all material times, it has engaged in the business of selling potash. (TAC ¶ 10.)

6. Central Potash was incorporated under the laws of Ontario. Pursuant to the terms of an amalgamation agreement dated January 31, 1979, and by articles of amalgamation effective February 1, 1979, Central Potash and Noranda amalgamated and continued as one entity under the name "Noranda Metals Industries Limited." On or about December 30, 1978, Noranda Metals Industries Limited changed its name to "407538 Ontario Limited." (TAC ¶ 20.)

In addition to Plaintiffs' price-fixing claim, Plaintiffs further allege that they and members of the class they seek to represent had no knowledge that Defendants were violating the law, and that they could not have discovered such violation because the Defendants fraudulently concealed their conspiracy. (*Id.* ¶ 56.)

Based upon the price-fixing allegations contained in Plaintiffs' TAC, on October 24, 1994, the Plaintiffs moved to certify the following class:

> all purchasers (excluding governmental entities, defendants, subsidiaries and affiliates of defendants, co-conspirators of defendants, and other producers of potash and their subsidiaries and affiliates) in the United States of potash directly from defendants or any subsidiary or affiliate thereof at any time during the period April 1987 to and including the date of filing of this Complaint.[7]

(TAC ¶ 32.) Plaintiffs maintain that certification of this class is warranted because: (1) class members are so numerous and geographically dispersed that joinder is impracticable; (2) their claims involve the same issues of law and fact common to the class, and these common issues predominate over individual issues unique to any class member or members; (3) their claims are typical of the class they seek to represent; (4) they will fairly and adequately protect the interests of the class; and (5) a class action is the most efficient method for resolving their claims. (TAC ¶¶ 32–35.)

Defendants oppose class certification. Defendants make a variety of arguments which are individually addressed in the Court's discussion below. In general terms, however, Defendants contest certification of the proposed class because a significant majority of potash purchases were made by a limited number of high-volume purchasers, who qualified for special price discounts and incentives, while the named Plaintiffs purchased potash in comparatively smaller quantities and were unable to employ special purchasing techniques. Defendants also claim that potash is not a fungible, standardized commodity. As a result of these factors,

Defendants assert that the named Plaintiffs cannot adequately represent the interests of the high-volume purchasers included in the proposed class; that the alleged conspiracy could not have had an impact common to the entire class; and that the diversity in the potash market, in potash products, and in purchasing methods used by the proposed class members will cause individual questions to predominate over any questions common to the proposed class.

Plaintiffs allege that the Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 (authorizing civil actions for monetary damages to redress violations of the Sherman Act) and 26 (authorizing civil actions for injunctive relief), and 28 U.S.C. § 1337. Venue as to each Defendant is proper in this judicial district pursuant to 15 U.S.C. §§ 22 and 28 U.S.C. § 1391. Defendants do not contest either jurisdiction or venue.

### III. Discussion

#### A. Standard of Decision

The requirements for class certification are set forth in Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs have the burden of establishing they have satisfied each of Rule 23's class certification requirements. *General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Jenson v. Eveleth Taconite Co.,* 139 F.R.D. 657, 659 (D.Minn.1991). The Court may only certify the class if it is satisfied "after rigorous analysis" that all of Rule 23's prerequisites are met. *Jenson,* 139 F.R.D. at 659. However, in making the Rule 23 analysis, the substantive allegations in the plaintiffs' complaint are accepted as true. *Jackson v. Rapps,* 132 F.R.D. 226, 230 (W.D.Mo.1990); *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (explaining that courts do not have authority to "conduct a preliminary inquiry into the merits of a suit in determining whether it may be maintained as a class action"). Additionally, because of the important role class actions play in the private enforcement of antitrust actions,

---

7. The TAC was filed on July 8, 1994.

courts resolve doubts in these actions in favor of certifying the class. *In re Infant Formula Antitrust Litig.*, MDL No. 878, 1992 WL 503465 at \*3 (N.D.Fla.1992); *In re Control Data Corp. Securities Litig.*, 116 F.R.D. 216, 219 (D.Minn.1986); *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). Notwithstanding this presumption, district courts ultimately retain broad discretion in determining whether or not to certify a class under Rule 23. *General Telephone Co. v. Falcon*, 457 U.S. at 161, 102 S.Ct. at 2372; *In re Workers' Compensation*, 130 F.R.D. 99, 103 (D.Minn.1990).

### B. Rule 23(a) Analysis

Rule 23 of the Federal Rules of Civil Procedure sets out four preliminary requirements for class certification. In order to be certified as a class, Rule 23(a) requires a party to show:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). The Court will consider each of these requirements in turn.

### 1. Numerosity

■ In order to maintain a class action, Plaintiffs must show that the class of plaintiffs is so large that joinder of all members would be "impracticable." *In re Federal Skywalk Cases*, 680 F.2d 1175, 1178 (8th Cir.1982). Plaintiffs allege Defendants engaged in a national scheme to illegally fix the wholesale price of Potash. The class Plaintiffs seek to represent contains thousands of farm co-ops, agricultural distributors and farmers who purchased potash between April 1987 and July 8, 1994. (Pls.' Mem. in Supp. of Class Cert. at 5.) Defendants do not challenge Plaintiffs' showing of the numerosity requirement, and based upon the geographical dispersion and number of putative class members, the Court finds that such a challenge would be unavailing. Plaintiffs have sufficiently shown that joinder of all putative members would be impracticable.

### 2. Commonality

■ Plaintiffs have alleged questions of law and fact which are common to the proposed class. According to Plaintiffs, these common questions of law and fact include (1) "whether the defendants conspired among themselves and with others to fix, raise, maintain and/or stabilize prices of potash sold in the United States" and (2) "whether defendants' conduct caused injury to the business or property of plaintiffs and the members of the class, and if so, the appropriate class-wide measure of damages." (TAC ¶ 29.)

Insofar as Plaintiffs allege that Defendants engaged in a conspiracy to fix the wholesale price of potash, they have satisfied the commonality requirement of Rule 23(a). *See In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1034 (N.D.Miss.1993) (holding that alleged price-fixing conspiracy involved common questions relating to the existence and proof of illegal agreement); *In re Workers' Compensation*, 130 F.R.D. 99, 105 (D.Minn.1990) (recognizing that "[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy"); *see generally* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.05 at 18–15–21 (3d ed. 1992) (explaining that an "allegation of price fixing ... will be viewed as a *central* or *single overriding* issue or a *common nucleus of operative fact* and will establish a common question") (emphasis original).

All putative class members have a common interest in any proof of a concerted action, conspiracy, and of agreement with the aim and result of restricting trade in the potash industry by fixing the price of wholesale potash. If Plaintiffs cannot prove these elements, no one in the twelve individual suits recovers. These elements are accordingly common to the claims of all members of the class. Defendants do not dispute that, for

the purposes of Rule 23(a), Plaintiffs have alleged a common question of fact or law; the more difficult question for certification, and that challenged by Defendants, is whether the alleged common questions *predominate* over individual questions. The Court will take up this question in its Rule 23(b) analysis. For the purposes of Rule 23(a), however, Plaintiffs have satisfied the commonality requirement.

### 3. *Typicality*

A putative class will not be certified unless "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality is satisfied "when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members." *In re Workers' Compensation,* 130 F.R.D. at 105 (*quoting Dirks v. Clayton Brokerage Co. of St. Louis, Inc.,* 105 F.R.D. 125, 132–33 (D.Minn.1985)). Thus a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985). This provision requires that each representative's claim be sufficiently similar to those of the class to permit a court to conclude that (1) the representative will adequately protect the interests of the class and (2) there are no antagonistic interests between the representatives and the class. *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268, 270 (D.Minn.1989).

Defendants' Rule 23(a)(3) [8] challenge focuses on the relative quantities of potash the putative class members purchased. Defendants argue that the claims of the named Plaintiffs are not typical of the putative class because their purchasing arrangements were "markedly different from the vast majority of the class they seek to represent." (Defs.' Mem. in Opp. to Class Cert. at 15.)

Defendants characterize the named representatives as small, local retailers/end-users who purchase potash in nominal quantities on an as-needed basis. According to Defendants, approximately 75% of agricultural potash purchases are made by regional cooperatives and national and major regional wholesalers/retailers,[9] while another 20% of agricultural potash purchases are made by major regional retailers. Defendants contend that these large-volume purchasers have special arrangements which lead to "individualized relationships" with potash producers, and many consequently engage in price bargaining and negotiations unavailable to the named Plaintiffs.[10] As a result of these differences, Defendants claim that the named plaintiffs are not "typical" of the majority of potash purchasers in the putative class.

Although the Plaintiffs admittedly purchased potash in smaller quantities and were not privy to special high-volume benefits available to their larger counterparts, Rule 23(a)(3) does not require that all members of a proposed class pay the same amount or use similar purchase methods in

---

**8.** Defendants combine their Rule 23(a)(3) and Rule 23(a)(4) analyses. Defendants correctly point out that these Rules essentially have the same purpose of ensuring that the interests and goals of the named representatives are sufficiently aligned with those of the putative class. As many courts have recognized, the typicality and adequacy requirements of Rule 23(a) significantly overlap. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982); 3B Moore's Federal Practice ¶ 23.06–2 at 23–169 (2d ed. 1993 & Supp.1994) (noting that "[t]he [Rule] (a)(3) requirement that claims or defenses be 'typical' has been equated with the requirement that the representative party must adequately represent the class, or with one of the elements usually considered as part of this adequacy requirement") (citing cases). The Court will, however, engage in the analytical schema established by the Rules.

**9.** Defendants allege there are only 25–30 purchasers who fit in this category. (*See* Defs.' Mem. in Opp. to Class Cert. at 12 & 12 n. 6.)

**10.** Specifically, Defendants claim that these large-volume purchasers are able to use their superior bargaining positions to obtain volume discounts, off-season price discounts, and special inventory fill promotional discounts; they are able to obtain more favorable pricing through long-term contracts and/or special bid quotes; and are able to utilize warehousing arrangements and other storage, distribution, inventory, transportation or handling arrangements to further reduce price. (Defs.' Mot. in Opp. to Class Cert. at 13.)

order to pursue an antitrust price-fixing claim.[11] Similarly, Rule 23(a)(3) does not require the representative plaintiffs to have the same claim size or financial interest as the class they seek to represent. Courts routinely have held that "small" claim size will not prohibit class certification.[12] *See* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.27 at 3–146–47 & n. 388 (3d ed. 1992) (recognizing that the number of class representatives is not significant under Rule 23(a)) (citing cases).

Thus the focus of Rule 23(a)(3)'s typicality requirement is whether pursuing a class action implicates conflicting interests within the class; the fact that members purchase differing quantities and pay different prices does not change this analysis. This Court has recognized that "[a]ntitrust price fixing cases generally involve claims which satisfy Rule 23(a)(3)'s typicality requirement," and has specifically explained that:

> If the representatives must prove "a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative

claims can hardly be considered atypical." (Quotation omitted.) "The fact that the purchases were not made from all of the defendants, or that all of the methods through which the conspiracy was allegedly effected were not utilized against the named plaintiffs is not dispositive of their ability to represent the class." (Quotation omitted.) Nor will differing damages, resulting from varied methods of procuring and purchasing the product, defeat satisfaction of Rule 23(a)(3).

*In re Workers' Compensation*, 130 F.R.D. at 106.

Insofar as the Defendants challenge the typicality of Plaintiffs' claims, the Defendants' arguments are not persuasive. In this case, the named Plaintiffs have alleged an antitrust price-fixing scheme whereby Defendants conspired to illegally control potash prices. The claims asserted on behalf of the putative class involve the same legal theory (viz. violation of Section 1 of the Sherman Act) and involve the same elements of proof in relation to the existence, scope, duration,

---

**11.** There is a wealth of authority supporting this position. *See In re Brand Name Prescription Drugs Antitrust Litig.*, MDL No. 997, 1994 WL 663590 (N.D.Ill.1994); *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019 (N.D.Miss.1993) (holding that class of catfish purchasers satisfied typicality requirement despite purchasers' varying sizes, geographical locations, and buying methods because the substance of antitrust price-fixing claim was the same for all class members); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 699 (N.D.Ga.1991) (holding typicality requirement satisfied because named plaintiffs' claims stemmed from same legal theory as class claims notwithstanding fact that class purchased tickets at different prices according to different terms); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 270, 272 (finding typicality requirement satisfied when the scope, impact and existence of alleged conspiracy was the same for all class members notwithstanding defendants' claims of disparity in pricing procedures, individualized markets and individually negotiated prices); *In re South Central States Bakery Prod. Antitrust Litig.*, 86 F.R.D. 407, 415 (M.D.La.1980) (factual variations do not destroy typicality where all purported class members must establish same elements of price-fixing claim); *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 566 (D.Minn.1968) (claims of representative parties satisfied typicality requirement because proof of conspiracy and price fixing were common to all notwithstanding defendants' argument that claims were atypical because of

diverse methods of procuring and producing fabricated steel); *see also* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.13 at 3–79 & n. 208 (3d ed. 1992) (explaining that "differences in the methods of purchase or kinds of products purchased among class members have been held not to bar a finding of typical claims" in price-fixing actions, and that "in class actions charging defendants with a conspiracy to fix prices, the claims of the named plaintiffs were held typical of the claims of the class members despite variations in the manner in which members of the class purchased from the defendants, variations in the kind of products purchased, differences in price, and other factors") (citing cases).

**12.** In rejecting a claim that the named plaintiffs must have a large financial interest in the litigation, one court explained that:

> To assert that the minute interest of the parties before the court is a factor which militates against allowing a class action is to ignore the spirit of Rule 23. Since, as we have seen, if the plaintiffs' claim is very large, the class action is rendered unnecessary, the main purpose of the class action is to provide a means of vindicating small claims. It would be anomalous to hold that only major financial interests can make use of it.

*Dolgow v. Anderson*, 43 F.R.D. 472, 495 (E.D.N.Y.1968).

and success of the alleged conspiracy. Thus the Plaintiffs' allegations are sufficient to satisfy Rule 23(a)(3)'s typicality requirement.

Defendants also argue that Plaintiffs have failed to show typicality because there exist antagonistic interests within the proposed class. Conflicting interests within a class are more directly analyzed under the Rule 23(a)(4) adequacy analysis. As a result, to the extent the Defendants rely upon conflicting interests between members of the proposed class, these interests will be addressed in the following Rule 23(a)(4) analysis.

### 4. Adequacy

■ The fourth requirement of Rule 23(a) requires Plaintiffs to show that the representatives will "fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a). In order to satisfy this requirement, Plaintiffs must show that (1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 270; *see also In Re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1037 (N.D.Miss.1993) (explaining that "[a]dequate representation turns upon the qualifications and experience of plaintiffs' counsel to conduct the litigation and whether the plaintiffs have any interests antagonistic to the class").

■ Defendants do not object to the ability and competence of Plaintiffs' counsel, nor would such objection be warranted. Instead, Defendants claim that the Plaintiffs are not adequate to represent the putative class because Plaintiffs' long-term market objectives and interests conflict with those of the majority of the putative class. Specifically, Defen-

dants refer to the large-volume purchasers' interest in the "long-term health of the potash industry" and allege that "[u]nlike the named plaintiffs, a primary market objective of the larger volume purchasers is securing a long-term source of potash for their customers so that their needs will be met ... fifteen years from now." (Defs.' Mem. in Opp. to Class Cert. at 15.) In support of this contention, Defendants have furnished affidavits from several large-volume purchasers who oppose class certification.[13]

Assuming, as we must, that the allegations in the Plaintiffs' Complaint are true, the fact that an illegally controlled potash market tends to favor the long-term interests of several large members of the putative class is not sufficient to prevent class certification. This is not an interest the law is willing to protect. *See* 3B Moore's Federal Practice ¶ 23.06–2 at 23–182 (2d ed. 1993 & Supp. 1994) (a court is not authorized to dismiss a class action based upon a substantial legal claim merely because some members of the class prefer to leave the violation of their rights unremedied) (citing cases); *White v. Local 942, Laborers' Int'l Union of N. Am.*, 90 F.R.D. 368, 372 (D.Ala.1981) (holding that a class plaintiff who seeks to assert statutory rights to protect a class of which he is a member is not asserting rights antagonistic to any members of that class).

Moreover, those large-volume purchasers who do not wish to participate in the proposed class action are free to opt out of the class pursuant to the procedure set forth in Rule 23(c)(2).[14] The Court is satisfied that there are no significant antagonistic interests within the class. Apart from the interest Defendants assert in a stable, albeit presumptively illegal, potash market, Defendants have not demonstrated how pursuing

---

13. *See* Addis Aff. ¶ 21 ("I do not believe that the litigation is in the long-term interest of The Andersons or other major potash purchasers who rely on consistent and reliable distribution relationships with their suppliers"); Gauss Aff. ¶ 25 ("I do not believe that the litigation is in the long-term interest of Northern Star or other major potash purchasers who rely on consistent and reliable distribution relationships with their suppliers").

14. If, as Defendants allege, 95% of the potash sold in the United States is bought by large-volume purchasers, (Defs.' Mem. in Opp. to Class Cert. at 1), then these purchasers could presumably protect any alleged interest in a "stable market" by opting out of the class. The remaining 5% hardly suffices to warrant Defendants' apocryphal "parade of horribles" relating to market instability. If the large-volume purchasers chose not to opt out, their interests will presumably not be maligned with Plaintiffs.

this price-fixing claim implicates viable antagonistic interests. *See, e.g., In re Workers' Compensation*, 130 F.R.D. 99, 108 n. 7 ("[n]aked allegations of antagonism are insufficient to undermine certification pursuant to Rule 23(a)(4)").

As a result, the Court finds that Defendants have satisfied the numerosity, commonality, typicality and adequacy requirements set forth in Rule 23(a).

### C. Rule 23(b) Analysis

In addition to satisfying all of the criteria of Rule 23(a), a party seeking class certification must also satisfy one of the requirements of Rule 23(b). Plaintiffs claim they have satisfied Rule 23(b)(3), which requires (1) "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

#### 1. Predominance

There are no bright lines for determining whether common questions predominate. *In re Workers' Compensation*, 130 F.R.D. 99, 108 (D.Minn.1990); 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1778 at 526 (2d ed. 1986 & Supp.1994). Instead, considering the facts of the case presented, a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, classwide basis, since such proof obviates the need to examine each class member's individual position. *In re Workers' Compensation*, 130 F.R.D. at 108 (citing *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 288 (N.D.Ill. 1983)). Common questions need only predominate; they need not be dispositive of the litigation. *In re Infant Formula Antitrust Litig.*, MDL No. 878, 1992 WL 503465 at *6 (N.D.Fla.1992); 7A Wright, *Federal Practice and Procedure*, § 1778 at 528–30 ("[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to

be tried separately. Typically this situation arises in antitrust ... actions.").

##### a. Presumption

A mere allegation of price-fixing will not satisfy Rule 23(b)'s predominance requirement. *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1039 (N.D.Miss.1993). However, as a general rule in antitrust price-fixing cases, questions common to the members of the class will predominate over questions affecting only individual members. *See id.* ("[a]s a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment"); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 271 (D.Minn.1989) ("[p]laintiffs have alleged a nationwide horizontal price fixing conspiracy ... [p]roof of such an antitrust violation involves primarily common issues of fact and law"); *In re Infant Formula Antitrust Litig.*, MDL No. 878, 1992 WL 503465 at *6; ("[w]here a horizontal price-fixing conspiracy is alleged, the questions common to the class predominate over questions that may affect only individual class members"); 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.28 at 18–98–99 (explaining that "[a]s a rule, the allegation of a price fixing conspiracy is sufficient to establish predominance of common questions," and also noting that other common questions include whether each defendant participated in the conspiracy and whether the conspiracy has continued and should be enjoined) (citing cases). In the face of this presumption, Defendants argue, like countless antitrust defendants before them, that "this case is different."

##### b. Legal Standard

To determine whether common questions of law or fact predominate over individual questions, a court must evaluate the substantive allegations in the plaintiffs' complaint. In this case, Plaintiffs have alleged Defendants conspired to illegally control potash prices. To prevail on their price-fixing claims, Plaintiffs must demonstrate (1) a violation of the antitrust law, (2) direct injury (or impact) from the violation, and (3) damages sustained by the Plaintiffs. *In re*

*Workers' Compensation,* 130 F.R.D. at 108; *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. at 271; *In re Indus. Gas Antitrust Litig.,* 100 F.R.D. 280, 288 (N.D.Ill.1983).

Defendants claim that individual issues among class members will predominate because (1) class members paid different prices for potash, (2) potash prices were affected by market variables not common to each transaction, (3) potash prices were affected by Canadian trade disputes,[15] and (4) potash products are not fungible. (Defs.' Mem. in Opp. to Class Cert. at 22–23.) As a result, Defendants argue that there is no class-wide impact and that there is no class-wide mechanism to calculate damages.

The Court will evaluate these contentions as they relate to the requisite elements Plaintiffs must demonstrate in order to pursue their antitrust claim.

### c. Violation of Antitrust Law

■ Price-fixing is illegal per se under the Sherman Act, 15 U.S.C. § 1. *Citizen Publishing Co. v. United States,* 394 U.S. 131, 135, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). Whether Defendants agreed to fix the price of potash between April 1987 and July 8, 1994, clearly involves questions common to the entire class. This element relates solely to Defendants' conduct, and as such proof for these issues will not vary among class members. *See In re Catfish Antitrust Litig.,* 826 F.Supp. at 1039 ("[e]vidence of a national conspiracy to fix the price of catfish and processed catfish would revolve around what the defendants did, and said, if anything, in pursuit of a price fixing scheme"); *Transamerican Refining Corp. v. Dravo Corp.,* 130

F.R.D. 70, 75 (S.D.Tex.1990) (holding that proof of conspiracy is susceptible to generalized proof since focus is on what defendants did and said). Defendants do not dispute this component of Plaintiffs' Rule 23(b)(3) argument.

### d. Common Impact

■ Defendants vehemently argue, however, that the alleged conspiracy does not involve a class-wide common impact. Defendants claim that assessing the injury to members of the class requires an individual determination, transaction by transaction and member by member, and therefore involves predominantly individual issues. (Defs.' Mem. in Opp. to Class Cert. at 24.) Defendants' argument, although couched in terms of common impact, is directed both at proof of the quantum of damage Plaintiffs suffered and proof of the fact of injury. To the extent Defendants focus on the quantum of damage suffered in their common impact analysis, however, their focus is misplaced. Common proof of impact is possible without common damage amounts. *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. at 272 (finding common impact even though prices varied and were individually negotiated); *see also In re Workers' Compensation,* 130 F.R.D. at 108–09 ("Non-uniformity of the prices at which plaintiffs purchased their goods is not fatal to certification. (citation omitted) As long as the existence of a conspiracy is the overriding question, the class has met its predominance requirement." (citing cases)).

Thus the issue in the common impact analysis is the fact, not the amount, of injury.[16]

---

**15.** Specifically, Defendants contend that transaction prices during the relevant time period were affected by a United States Antidumping investigation and by Saskatchewan prorationing legislation. (Defs.' Mem. in Opp. to Class Cert. at 22.) Plaintiffs claim, however, that Defendant potash producers filed a petition with the United States International Trade Commission alleging Canadian potash was being "dumped" into the United States in furtherance of their conspiracy to fix potash prices. (TAC ¶¶ 48–49.)

**16.** This is an element essential to an antitrust price-fixing claim and one common to the class. The fact that some Plaintiffs may have paid more or less than others, although relevant in assessing damages, does not affect whether the con-

spiracy, if proven, would have had an impact common to the class. *See In re Workers' Compensation,* 130 F.R.D. at 110 (in considering whether insurers conspired to fix insurance rates, the Court explained that "the multiple factors which affect rates" relates to damages, not whether there was common proof of impact); *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. at 271–272 (explaining that "common proof of impact is possible even though prices" are "individually negotiated," and that defendants' reliance on "localized and unique" markets and pricing procedures related to damages, not common fact of injury); *In re Domestic Air Transp.,* 137 F.R.D. 677, 689 (N.D.Ga.1991) (holding common impact satisfied because alleged price-fixing resulted in an "artificial" base price, even though

Plaintiffs have alleged an impact common to the class. Plaintiffs contend that as a result of Defendants' illegal agreements, they paid more for potash than they would have paid in the absence of such agreements. (TAC ¶ 59.) In other words, according to Plaintiffs, the predominate question for all class members is whether, as a result of Defendants' conspiracy, the price they paid for potash was artificially high because competition was removed from the market. If Plaintiffs can show this to be true, they will have satisfied the common impact requirement.

Although the Defendants' argument relates in part to Plaintiffs' individual damages, Defendants do argue that not all Plaintiffs paid above a competitive price, irrespective of amount. (Defs.' Mem. in Opp. to Class Cert. at 24.) This argument is properly directed at the common impact element. Defendants' argument is not, however, persuasive.

First, because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a pre- sumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market. *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y.1982); *see also In re Catfish Antitrust Litig.*, 826 F.Supp. at 1041 ("[i]n an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price") (citing *In re Alcoholic Beverages*); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n. 11 (2d Cir.1975) ("jury could reasonably conclude that [Defendants'] conduct caused injury to each [class member]" if national conspiracy had the effect of "stabilizing prices above competitive levels").

Notwithstanding this presumption, Plaintiffs cannot demonstrate common impact by simply *alleging* a price-fixing conspiracy. *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1039. Indeed, despite price-fixing allegations, several courts have declined to find common impact in highly diverse and individualized markets.[17] Plaintiffs do not rely sole-

actual fares were discounted or negotiated); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 56 (D.Mass.1981) (holding that because fact of injury was a "distinct question" from quantum of injury, common proof could establish class-wide injury even though amount of damage to each plaintiff was uncertain); *Hedges Enterprises, Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 475 (E.D.Pa.1979) (finding common impact despite negotiated or discounted prices when plaintiffs alleged artificial minimum became "base" price); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, MDL No. 997, 1994 WL 663590 at *5 (N.D.Ill.1994) ("proof of the merits of the plaintiffs' claim will not be contingent upon an individualized analysis of each and every transaction between each plaintiff and each defendant. Rather a liability determination will … hinge upon a showing of industry-wide practices, meetings, policies and agreements. Accordingly, despite the heterogenous nature of 'brand name prescription drugs' the fact of antitrust injury is a common, predominate question susceptible to common class-wide proof.")

17. For example, Defendants cite *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977), as authority for the proposition that the alleged diversity in the potash market precludes a common impact finding in this case. Defendants rely upon *Windham* for more than it represents. In *Windham*, the Fourth Circuit reviewed a district court's refusal to certify a class of flue-cured tobacco growers. The *Windham* court did not rely merely upon the size of the purchasers, the fact that prices were individually negotiated, or the fact that there were several grades of flue-cured tobacco. Instead, the *Windham* court, over a dissent, recognized that among other problems with the proposed certification, flue-cured tobacco was a non-standardized, non-fungible product; it had 161 different government grades; it was purchased by buyers using their own, internally different grading systems out of 36 different warehouses in 11 distinct geographical regions; and its price varied from day to day, government grade to government grade, market to market, and was improperly altered by auctioneers, not named as parties to the action, who occasionally manipulated auction results. Although potash is available in several grades, has several different applications, and may be in the form of potassium chloride or potassium sulfate, the diversity in the potash market does not approach that of the flue-cured tobacco market discussed in *Windham*. Based upon the material presented, it appears that potash is a relatively homogenous product, and accordingly that the limited variations involved in this action are not so diverse as to create predominantly individual issues. In fact, Plaintiffs have provided evidence that only 2.2% of the transactions cited by Defendants involve potassium sulfate, and that potassium chloride, the vast majority of the potash at issue, is fungible and has officially been characterized by the International Trade Commission as "one like product." (*See* Rauser Suppl. Aff. ¶¶ 40–41.) Moreover, and not inconsequentially, the *Windham* court did not hold that the class

ly upon a price-fixing allegation. Instead, they offer an evaluation of the potash market conducted by Professor Gordon C. Rauser, an agricultural economist. Professor Rauser examined the prices paid before and during the alleged conspiracy, the Defendants' price lists, and actual transaction data.[18]

Professor Rauser opined that a conspiracy to fix the price of North American potash would have a common impact on all members of the proposed class. Specifically, Professor Rauser concluded that "[p]rices for all types of potash increased dramatically and uniformly in 1987 and have remained relatively constant since that time," that the "transaction prices display a uniform pattern," that Defendants' "list prices" for their potash products "serves as a common starting point for negotiation of the eventual transaction price,"[19] and that "potash prices follow a similar pattern that is determined by external, economic forces that are common to all members of the class." (Rauser Aff. ¶ 5; Rauser Suppl. Aff. ¶¶ 5, 45.)

In *In re Workers' Compensation,* the court examined the common impact an alleged price-fixing scheme had on a plaintiff class, notwithstanding individual negotiations, varied purchase methods, and different amount and types of the product (workers' compensation insurance) purchased. That court explained:

As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement. To prove injury, plaintiffs need only demonstrate they have suffered some damage from the unlawful conspiracy. Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.

*In Re Workers' Compensation,* 130 F.R.D. at 109 (citations omitted). In this case, Plaintiffs have provided evidence, through Professor Rauser's analysis, to show that the conspiracy succeeded in increasing prices above the competitive level. This evidence is not unique to each class member, but is common to the class and susceptible to class-wide proof.

Defendants have proffered an analysis of their own economics expert, Joseph W. McAnneny. Mr. McAnneny examined price lists and transaction data supplied by the Defendants and concluded that they did not support a finding of common impact. Specifically, Mr. McAnneny stated that:

Our study of defendants' transaction records establishes that ... potash prices show a high degree of diversity, I have not found the kind of simplified price structure that would be consistent with an operating price-fixing agreement encompassing all the transactions that plaintiffs would in-

proposed could not have been certified, it held that "the denial of class certification was not an abuse of discretion on the part of the district court." *Windham,* 565 F.2d at 62. The dissent found that failure to certify the class, at least with regard to the Sherman Act price-fixing allegation, was an abuse of discretion. *Id.* at 72 (Butzner, J., dissenting, incorporating opinion of *Windham v. American Brands, Inc.,* reported at 539 F.2d 1016 (4th Cir.1976)).

18. Professor Rauser has submitted two affidavits alleging that a national price-fixing conspiracy in the potash market would have a common impact on potash purchasers. In his first Affidavit, Professor Rauser based his opinion on a variety of publicly available information relating to the potash industry, including industry summaries of monthly potash prices. (*See* Rauser Aff. ¶ 5.) In his Supplemental Affidavit, Professor Rauser also considered statistical information furnished to him by the Defendants relating to actual transaction prices and the Defendant producers' "list" prices. In his Supplemental Affidavit, Professor

Rauser examined this new material and concluded that "nothing has altered my earlier conclusion that the alleged price fixing conspiracy would have common impact on all members of the proposed class, or that a common formula exists with which to determine damages." (Rauser Suppl. Aff. ¶ 5.) Professor Rauser also stated, however, that the material supplied by the Defendants was incomplete and inconsistent. (*Id.* at ¶ 5.)

19. The alleged uniformity in price lists is particularly significant. In *In re Domestic Air Transp.,* the court found the common impact element satisfied notwithstanding individual price negotiations because the alleged price fixing resulted in an "artificial" base price from which individual sale prices were negotiated. 137 F.R.D. 677, 689 (N.D.Ga.1991). *See also Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979) (finding common impact despite negotiated or discounted prices when plaintiffs' alleged artificial minimum became "base" price).

clude in the class[ ] they seek to represent. Thus even assuming the truth of plaintiffs' allegations that defendant producers entered some kind of price-fixing agreement, I conclude that either (1) the assumed agreement was not intended to cover a significant portion of the proposed class members' transactions or (2) if the assumed agreement was intended to cover all those transactions, because of the inherent instability of such an agreement in the context of the potash industry, it failed in its intended impact. In any case, injury, if any, to members of the class[ ] plaintiffs seek to represent cannot be demonstrated on a common or uniform basis.

(McAnneny Aff. ¶ 42.)

■ This case presents the familiar "battle of the experts." The certification stage of this litigation is not, however, the proper forum in which to resolve this battle. Faced with conflicting expert testimony regarding the complexity, diversity and various pricing strategies in the catfish market, the court in *In re Catfish Antitrust Litigation* aptly explained that "[w]hether or not plaintiffs' expert is correct in his assessment of common impact/injury is for the trier of fact to decide, at the proper time." 826 F.Supp. at 1042 (citation omitted). Without trenching on the merits, in considering a class certification motion, a court must consider only whether plaintiffs have made a threshold showing "that what proof they will offer will be sufficiently generalized in nature that ... the class action will provide a tremendous savings of time and effort." *In re Screws Antitrust Litig.*, 91 F.R.D. at 57. Based upon the analyses offered by Messrs. Rauser and McAnneny, the Court is satisfied that this case is not so dissimilar from the litany of antitrust price-fixing cases which have rejected claims that product and market diversity prevented a showing of common impact.

### e. Damages

■ Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all. *In re Indus. Gas Antitrust Litig.*, 100 F.R.D. 280, 306 (N.D.Ill.1983). This relaxed standard flows from the equitable notion that the wrongdoer should not be able to profit by insistence on an unattainable standard of proof. *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1042–43. Moreover, the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis. This Court has recognized that "[t]he amount of damages largely involves individualized questions. This is typically true in antitrust class actions, however, and does not preclude certification." *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. at 272 (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977), *cert. denied* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)); *see also In re Workers' Compensation*, 130 F.R.D. at 110 ("[i]ndividual questions of damages are often a problem encountered in an antitrust action and are rarely a barrier to certification").

■ Plaintiffs have proffered several reasonable damage methodologies. After analyzing the potash market and Plaintiffs' claims, Professor Rauser opines that damages suffered by members of the Plaintiff class may be determined, with a substantial degree of precision, by means of a formula. (Rauser Aff. ¶ 34.) This calculation involves a two-step process: first, an "overcharge" is determined by computing, on either an absolute or a percentage basis, the difference between the price the Plaintiffs actually paid and the price they would have paid in a truly competitive market; second, the overcharge is applied to the unit or dollar volume of each class member's purchases from the Defendants during the conspiracy to calculate the damages sustained by each class member. (*Id.*)

Professor Rauser has proposed three methods whereby the overcharge may be computed:

36. In the first method, data from a time not part of the price-fixing conspiracy are

collected and statistically analyzed. Using widely accepted economic and econometric methods, a model of the industry is constructed that can then be used to "forecast" what the price would have been in the absence of the conspiracy.... This approach is widely known and accepted in the economics profession and has been used in many class action price fixing suits.

. . . . .

38. The second method is an extension of the first. In this method, data from both the conspiracy and non-conspiracy periods are collected and statistically analyzed. Accepted econometric methods are applied to the data to isolate any effects of the conspiracy on prices. The price of potash in the absence of the conspiracy is determined by solving the equation(s) while expunging the effects of the conspiracy.

39. The final method compares profits in the potash industry during the conspiracy with those obtained either in a non-conspiracy period or with those experienced by another industry with similar characteristics not subject to a price fixing conspiracy. This method would essentially find the price of potash that results from the cost of production (including capital investments), when firms make normal competitive profits. Similar industries, in terms of capitalization and risk, are studied to determine the normal profit rate. That would then be the non-conspiracy price used in the general damage formula.

(Rauser Aff. ¶¶ 36–39.) These methods, although probably not as facile as Plaintiffs suggest, are not so unsubstantial as to amount to no method at all. In fact, these or similar methods have been used to calculate damages in other antitrust price-fixing cases. *See In re Catfish Antitrust Litig.,* 826 F.Supp. at 1043 (citing cases). As a result, Plaintiffs have sufficiently demonstrated that common issues relating to Defendants' liability predominate over potential individual damage issues.[20]

Moreover, various judicial methods are available to resolve individual damage issues without precluding class certification. Among the methods available to the Court are: (1) bifurcating liability and damage trials; (2) appointing special masters or magistrates to preside over individual damage proceedings; (3) decertifying the class after the liability trial, if liability and damages are separated; (4) establishing presumptions or inferences of reliance or causation which are predicates to damage entitlement; (5) using the defendants' transactional records to compute individual damages; and (6) creating subclasses. *See* 1 Herbert H. Newberg, *Newberg on Class Actions,* § 4.26 at 4–91–97 (3d ed. 1992) (citing cases for each proposed method); *see also In re Bally Mfg. Securities Corp. Litig.,* 141 F.R.D. 262, 268 (N.D.Ill. 1992) (noting that risk "certification would expand the litigation beyond all reasonably controlling bounds ... is better addressed further down the road, if necessary, by altering or amending the class, not by denying certification at the outset") (quotation omitted).

#### f. Fraudulent Concealment

 The majority of Plaintiffs' claims in this litigation are timely. However, claims arising more than four years before this case was first filed require proof of fraudulent concealment.[21] The doctrine of fraudulent

---

20. The history of Rule 23(b)(3) also suggests that individual damage issues should not preclude class certification. In describing Rule 23(b)(3) the Rules Advisory Committee explained that "[a] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." Rules Advisory Comm. Notes to 1966 Amendments to Rule 23, 39 F.R.D. 69, 103 (1966). This same rationale is manifestly applicable to damages caused by a national conspiracy.

21. Plaintiffs' damage claims are instituted under Section 4 of the Clayton Act, codified at 15 U.S.C.A. § 15 (1973 & Supp.1994). Section 15b provides that "[a]ny action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued." Since the first complaint in this action was filed on April 1, 1993, Defendants assert that claims arising before April, 1, 1989, should be barred. Plaintiffs' claim of fraudulent concealment, however, will toll the Clayton Act's statute of limitations. *State of Texas v. Allan Constr. Co.,* 851 F.2d 1526, 1528–29 (5th Cir.1988).

concealment requires Plaintiffs to show (1) Defendants concealed the conduct complained of and (2) despite the exercise of due diligence, Plaintiffs failed to discover the facts that form the basis of their claim. *In re Catfish Antitrust Litig.*, 826 F.Supp. at 1030. Defendants argue that questions of "discovery" and "due diligence" relating to Plaintiffs' fraudulent concealment claims are not common to the proposed class and will cause individual questions to predominate.

The great weight of authority indicates that, absent exceptional circumstances, individual questions that arise in proving fraudulent concealment will not operate to prohibit certification of a class seeking certification to pursue a price-fixing conspiracy. *See id.* at 1044 (reviewing cases); 1 Newberg, *Newberg on Class Actions*, § 4.26 at 4–104 ("[c]hallenges based on the statute of limitations, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability"). Issues relating to Defendants' alleged concealment will be common to the class. Although individual issues may arise with regard "discovery" and "diligence," these issues are not so problematic as to frustrate the efficacy of pursuing a class action resolution of this controversy. Rule 23(b)(3) does not require that common questions be dispositive or significant; it only requires that common questions predominate. *See* 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1778 at 528–30 (2d ed. 1986 & Supp.1994). Moreover, individual issues related to fraudulent concealment may be individually addressed in the damage phase of the litigation if bifurcation becomes appropriate. *See Greenhaw v. Lubbock County Beverage Ass'n*, 721 F.2d 1019, 1030 (5th Cir.1983). Accordingly, the Court finds that common issues of law and fact predominate over individual issues related to Plaintiffs' proof of fraudulent concealment.

On September 14, 1994, Defendants filed a Motion (Doc. No. 291) to strike the fraudulent concealment allegations from Plaintiffs' TAC.

### 2. *Superiority*

 Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Having found that common issues of law and fact predominate over individual questions, the Court finds that a class action is clearly the most efficient and convenient method to resolve this controversy.

Defendants have not specifically attacked this portion of the Plaintiffs' Class Certification Motion, nor would such an attack be persuasive. Separate proceedings would produce duplicate efforts, unnecessarily increase the costs of litigation, impose an unwarranted burden on this Court and other courts throughout the country, and create the risk of inconsistent results for similarly situated parties. Additionally, the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical. This in turn would result in unjustly enriching the Defendants; precisely the result antitrust laws are designed to remedy. Indeed, in addressing the superiority of the class action as a vehicle to pursue an antitrust price-fixing claim, the *United States Steel* Court explained:

> it is extremely difficult to bring an antitrust action against six major steel fabricators without the financial aid made possible by the class action device. Few are the individual claimants with a sufficient interest at stake or resources to bring a suit requiring proof of a conspiracy among business corporations. Discovery expenses alone normally would be prohibitive. The court therefore deems the class action device to be superior to any other alternative.... Since avoidance of multiplicity of litigation is greatly to be favored, the class action device as invoked in this instance will serve such purpose.

*Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 572 (D.Minn.1968).

The Court denied that Motion on November 7, 1994.

Furthermore, there is a presumption against dismissing actions for management reasons. *See In re Workers' Compensation,* 130 F.R.D. at 110. Although this case may prove to be complex, as do most price-fixing actions, the Court is satisfied that professional cooperation of counsel for the respective litigants together with the management methods available to the Court, will make resolution of this controversy reasonably manageable.

### 3. Rule 23(b)(3) Summary

 Both parties have cogently argued the benefits and risks of class certification. After reviewing the case law and arguments presented by counsel, the Court is satisfied that the interests of all parties can best be served by settling their differences in a single action. However, initial certification of a class is not immutable. Courts retain great discretion in managing class action proceedings. Rule 23(c)(1) specifically provides that "[a]n order under this subdivision ... may be altered or amended before the decision on the merits." If, as this case develops, class treatment proves to be inappropriate or otherwise not in the best interests of the Court or the parties, the Court will in its discretion make whatever reasonable modifications are necessary up to and including decertification.

## IV. Conclusion

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that Plaintiffs' Motion for Class Certification (Doc. No. 210) of a class consisting of:

all purchasers (excluding governmental entities, defendants, subsidiaries and affiliates of defendants, co-conspirators of defendants, and other producers of potash and their subsidiaries and affiliates) in the United States of potash directly from defendants or any subsidiary or affiliate thereof at any time during the period April 1987 to and including July 8, 1994.

is **GRANTED.**