**In re URETHANE ANTITRUST LITIGATION.**

**This Order Relates to the Polyether Polyol Cases.**

**No. 04–MD–1616–JWL.**

United States District Court, D. Kansas.

July 28, 2008.

## MEMORANDUM AND ORDER

JOHN W. LUNGSTRUM, District Judge.

This multidistrict litigation consists of numerous putative class action lawsuits in which plaintiffs claim that defendants engaged in unlawful price fixing conspiracies with respect to urethane chemical products in violation of the Sherman Act, 15 U.S.C. § 1. The court originally consolidated two separate sets of cases—the Polyester Polyol Cases and the Polyether Polyol Cases. The parties have settled the Polyester Polyol Cases, and those cases have been dismissed. This Memorandum and Order relates to the Polyether Polyol Cases, in which the polyether polyol plaintiffs (hereinafter, plaintiffs) are purchasers of certain polyether polyol products sold and manufactured by the polyether polyol defendants (hereinafter, defendants). This matter is presently before the court on

1. Actually, Quabaug Corporation and Elliott Company of Indianapolis, Inc. were permitted to intervene as named plaintiffs by way of a later court order (doc. 484). Elliott Company subsequently withdrew as a class representative (doc. 665).

Plaintiffs' Motion for Class Certification (doc. 552). The court has fully reviewed the record and the parties' oral arguments from the class certification hearing on July 21, 2008. After careful consideration of the matter, the court is now prepared to rule. Despite defendants' vigorous and well presented efforts to defeat class certification, the court believes that class certification is warranted under the applicable legal standards and the record before the court. For the reasons explained below, then, the court therefore will certify a class of purchasers of polyether polyol products under the revised product definition set forth in plaintiffs' reply brief.

## BACKGROUND

In the First Amended Consolidated Complaint (doc. 307), plaintiffs Seegott Holdings, Inc., Industrial Polymers, Inc., and Quabaug Corporation [1] allege that the defendants and others engaged in a price-fixing conspiracy for polyether polyol products in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The alleged conspirator defendants include Bayer AG. Bayer Corporation, Bayer MaterialScience LLC f/k/a Bayer Polymers LLC (collectively, the Bayer defendants); BASF AG, BASF Corporation (collectively, BASF); the Dow Chemical Company; Huntsman International LLC; and Lyondell Chemical Company. Plaintiffs have settled and dismissed their claims against the Bayer defendants. Thus, this action proceeds against the remaining defendants—BASF, Dow, Huntsman, and Lyondell.

The polyether polyol products that are the subject of the alleged conspiracy fall into essentially four categories—monomeric and polymeric diphenylmethane diisocyanate (MDI), toluene diisocyanate (TDI), polyether polyols, and polyether polyol systems. These chemical products are generally sold to and used by manufacturers, who use the products in manufacturing other end products.[2] MDI is a type of isocyanate that is used mainly as a raw material in the produc-

2. One might recall the slogan BASF has used in its television advertising: *"We don't make a lot of the products you buy. We make a lot of the products you buy better.®"*

tion of rigid insulation and structural foams.[3] TDI is another type of isocyanate, and it is used primarily as a raw material in the production of flexible foams such as those used in furniture, mattresses, packaging foam, and automobile seating.[4] Polyether polyols are intermediate chemicals that are generally combined with isocyanates (usually either MDI and/or TDI) to produce polyurethane polymers.[5] The parties generally refer to these three categories of products (polyether polyols, MDI, and TDI) as the "basic chemicals." These basic chemicals are the building blocks for polyurethanes.

These basic chemicals are distinct from the parties' discussion of polyether polyol "systems." A polyether polyol system is comprised of two liquid components (A and B). One of these components contains the isocyanate, such as TDI or MDI. The other component consists primarily of polyether polyols and other additives, including a catalyst. When the purchaser mixes the A side and the B side together, they react to form a specific type of polyurethane polymer.

The complaint alleges that the defendants engaged in a nationwide price-fixing conspiracy that affected plaintiffs and other direct purchasers by causing them to pay more for these products than they otherwise would have paid absent the conspiracy. The proposed class consists of all direct purchasers of polyether polyol products in the United States from January 1, 1999, through December 31, 2004. Plaintiffs now seek certification of a plaintiff class pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3).

BASF, Dow, Huntsman, and Lyondell oppose class certification primarily on the ground that plaintiffs have failed to show that antitrust injury and damages are susceptible to common proof on a class-wide basis, and therefore they contend that predominance and superiority are lacking. Their

theory is that the proposed class contains such an overly broad mix of purchasers and products, operating in multiple markets, that it would not be possible to analyze the putative class with common proof. In short, they contend that individual questions will predominate the claims in this case. Defendants also originally argued that plaintiffs have not defined the class with objective and ascertainable criteria. Furthermore, they contend that the named plaintiffs do not satisfy the requirements of typicality and adequacy.

## LEGAL STANDARD FOR CLASS CERTIFICATION

The standards for certifying a class action are set forth in Fed.R.Civ.P. 23. This rule requires all four prerequisites of Rule 23(a) and at least one of the three requirements of Rule 23(b) to be satisfied. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Integra Realty Res., Inc.,* 354 F.3d 1246, 1262 (10th Cir.2004). The decision whether to certify a class is committed to the broad discretion of the trial court. *Rector v. City & County of Denver,* 348 F.3d 935, 949 (10th Cir.2003); *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1287 (10th Cir.1999). The court must perform a rigorous analysis of whether the proposed class satisfies the requirements of Rule 23. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *J. B.,* 186 F.3d at 1287–88; *see also Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir.1988) (party seeking to certify a class is under a strict burden of proof to show that all of the requirements are clearly met). The court should accept the allegations in the complaint as true, although it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may ... consider the legal and factual issues presented by plaintiff's complaints." *J.B.,* 186 F.3d at 1290 n. 7 (quotation omitted; brackets in

---

**3.** MDI consumption mainly involves the use of polymeric MDI to make rigid and semi-rigid polyurethane foams, whereas lesser quantities of pure (monomeric) MDI are used mainly for reaction injection-molding.

**4.** TDI used in industrial applications is a mixture of two TDI isomers, the most common of which is referred to as 80/20 TDI.

**5.** Polyols can be classified as either poly *ether* polyols or poly *ester* polyols. Polyether polyols and polyester polyols have different physical properties. Polyether polyols constitute approximately ninety percent of the world's polyol use.

original). The court is to remain focused on the requirements of Rule 23 rather than looking at the merits underlying the class claim. *Shook v. El Paso County,* 386 F.3d 963, 971 (10th Cir.2004) (noting the question is not whether the plaintiffs will prevail on the merits, but rather whether the requirements of Rule 23 are met); *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988); *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir.1982).

## DISCUSSION

For the reasons explained below, the court finds that class certification is warranted. The court readily finds that the Rule 23(a) requirements of numerosity and commonality are satisfied. More to the heart of the parties' dispute, the court also finds that the Rule 23(b)(3) requirements of predominance and superiority are satisfied because plaintiffs have shown that they can present their case as to the two elements of an antitrust violation and injury in fact (i.e., impact) with class-wide proof. The fact that the damage element may involve more predominantly individualized issues does not defeat the fact that common issues will predominate the claim as a whole. Similarly, plaintiffs' allegations of fraudulent concealment can largely be proven with proof that is common to the class rather than individual to each class member. The court expressly rejects defendants' arguments that the named plaintiffs are not typical and adequate class representatives. Lastly, the court will appoint co-lead counsel and liaison counsel in the polyether polyol cases as class counsel and direct the parties to begin the process of disseminating class notice.

## I. *Definition of the Class*

In plaintiffs' original motion for class certification, they initially sought certification of the following class:

All persons and entities who purchased polyether polyols, monomeric or polymeric diphenylmethane diisocyanate (MDI), toluene diisocyanate (TDI), or polyether polyol systems except any such systems that also contain polyester polyols directly from a defendant at any time from January 1, 1999 through December 31, 2004 in the United States and its territories or for delivery in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries, and affiliates).

Defendants' threshold argument in their response brief is that plaintiffs' proposed class definition does not define the class with sufficiently definite and readily ascertainable criteria. *See* Manual for Complex Litigation § 21.222, at 270 (4th ed.2005) (class definition must be precise, objective, and presently ascertainable). Their argument is that this proposed class definition is unclear in three respects: (1) it does not distinguish between aromatic and aliphatic MDI and TDI, (2) it does not reference MDI and TDI prepolymers, and (3) it is not clear enough as to the types of polyether polyols included.

In response to the first argument, plaintiffs explain that the class definition does not need to distinguish between aromatic and aliphatic MDI and TDI because both are "aromatic in composition." SIR Consulting, *CEH Marketing Research Report: Diisocyanates and Polyisocyanates* (Dec.2005), at 11 (discussing the "most widely used diisocyanates and polyisocyanates" as "aromatic in their composition" and specifically discussing MDI and TDI). Furthermore, plaintiffs point out that in the deposition of defendants' expert, Richard T. Rapp, he testified that none of the non-settling defendants even manufacture aliphatic isocyanates. Thus, according to plaintiffs, there is no need to distinguish between whether the MDI and TDI at issue in this case is aromatic or aliphatic. In response to defendants' second argument concerning the lack of clarity about prepolymers, plaintiffs affirmatively state that prepolymers are not included in the class definition. According to plaintiffs, then, the product definition (which does not purport to include prepolymers) does not need to be revised in this respect.

In response to defendants' third argument, plaintiffs clarify that the polyether products at issue in this case are propylene oxide-based polyether polyols. This term, they point out, is used and recognized throughout

the industry. *See* SIR Consulting, *CEH Marketing Research Report: Polyether Polyols for Urethanes* (July 2002), at 15–18 (listing annual capacities of polyether polyol producers in terms of two categories: propylene oxide-based and PTMEG). They explain that pure ethylene oxide-based polyols (*i.e.,* not containing any propylene oxide) and PTMEG polyols are not propylene oxide-based, and therefore they are not included in the class. According to plaintiffs, this proposed clarification that the polyether polyols at issue here are those that are "propylene oxide-based" is similar to the polyester polyol plaintiffs' clarification that the only polyester polyols at issue in that set of consolidated cases were "aliphatic" polyester polyols. *See, e.g., In re Urethane Antitrust Litig.,* 237 F.R.D. 440, 445 (D.Kan.2006). Plaintiffs further explain that they wish to clarify that the product definition also includes MDI–TDI blends. In light of these points of clarification, in plaintiffs' reply brief they propose the following class definition:

> All persons and entities who purchased Polyether Polyol Products (defined below) directly from a defendant at any time from January 1, 1999 through December 31, 2004 in the United States and its territories (excluding all governmental entities, any defendants, their employees, and their respective parents, subsidiaries and affiliates). Polyether Polyol Products are: propylene oxide-based polyether polyols; monomeric or polymeric diphenylmethane diisocyanates (MMDI or PMDI—collectively, MDI); toluene diisocyanates (TDI); MDI–TDI blends; or propylene oxide-based polyether polyol systems (except those that also contain polyester polyols).

At oral argument, the court asked defense counsel whether plaintiffs and their proposed revised proposed product definition clarified the former ambiguities with respect to the products at issue. Defense counsel did not indicate any objection to plaintiffs' revised product definition. It appears to the court, then, that defendants' objections to the product definition were resolved by plaintiffs' response and plaintiffs' revised proposed product definition. Thus, the court accepts this as the proposed class definition that is now at issue, and rejects defendants' initial argu-ment that the proposed class definition is not sufficiently definite and ascertainable.

## II. *Class Certification*

In determining whether class certification is appropriate, the court must first find that the proposed class meets the four prerequisites of numerosity, commonality, typicality, and adequacy of representation set forth in Fed.R.Civ.P. 23(a). *In re Integra Realty Res., Inc.,* 354 F.3d 1246, 1262 & n. 3 (10th Cir.2004). If so, the court must then find that the plaintiffs' claim is maintainable as a class action under one (or more) of the three categories of suits described in Rule 23(b). *Id.* Based on the class certification record submitted by plaintiffs, the court readily concludes that the Rule 23(a) requirements of numerosity and commonality are satisfied here. The requirements contested by defendants are (1) the Rule 23(a) requirements of typicality and adequacy of representation as those issues relate to the proposed class representatives, and (2) the Rule 23(b)(3) requirements of predominance and superiority. The court turns first to the heart of defendants' opposition to plaintiffs' motion for class certification, which is their argument that plaintiffs cannot demonstrate that common questions predominate over individual questions or that a class action is superior to individual actions under Rule 23(b)(3).

### A. *Predominance and Superiority*

■ To certify a class under Rule 23(b)(3), the court must find that common questions "predominate over questions affecting only individual members" and that the class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623, 117 S.Ct. 2231. "The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005). If the proposed

class members will need to present evidence that varies from member to member in order to make out a prima facie case, then it is an individual question. *See id.* If, on the other hand, the same evidence will suffice for each member to make out a prima facie case, then it is a common question. *See id.*

To establish an antitrust violation, a plaintiff must prove (1) a violation of the antitrust laws, (2) that plaintiffs suffered some resulting injury from the violation, and (3) the measure of damages. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir.2006); *Blades*, 400 F.3d at 566. The parties do not dispute that the alleged antitrust violation will be subject to common proof. *See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001) (affirming district court's determination that common proof could be used to prove antitrust violations); *see also* 7A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice & Procedure § 1781, at 228 (3d ed.2005) (noting that "whether a conspiracy exists is a common question"); 6 Alba Conte & Herbert Newberg, Newberg on Class Actions § 18.28, at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions."). The point of their dispute is whether the issues of antitrust impact, damages, and fraudulent concealment are amenable to class-wide proof at trial.

### 1. *Injury from the Antitrust Violation, or "Impact"*

The second essential element of plaintiffs' horizontal price-fixing claim is that the proposed class suffered injury from the alleged antitrust violation—an element commonly called "impact." "An antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Elliott Indus. Ltd. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir.2005) (quotation omitted). This element arises from the fact that "[t]he Sherman Act was designed to protect market participants from anticompetitive behavior in the marketplace." *Id.* Thus,

the antitrust injury requirement allows a plaintiff to recover only if the plaintiff has suffered a loss that stems from a competition-reducing aspect of the defendant's behavior. *Id.* at 1124–25. This element can be "likened to the causation element in a negligence cause of action. The term means simply that the antitrust violation caused injury to the antitrust plaintiff." *State of Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir.1978).

Like most class certification motions involving horizontal price-fixing claims in cases of recent vintage, both parties have submitted and rely heavily on competing expert affidavits. Plaintiffs rely on the opinions of their expert economist, John C. Beyer, who has conducted an investigation of the polyurethane industry and analyzed defendants' prices, and has concluded that the alleged conspiracy would have impacted all members of the proposed class through higher prices for polyether polyol products than otherwise would have prevailed in the market. This conclusion rests on his understanding that during the class period the industry possessed the following characteristics: defendants enjoyed considerable market power; there was overlap in the defendants' geographic markets and channels of distribution; the production of polyether polyol products is marked by high entry barriers; polyether polyol products are interchangeable, commodity-like products; there are no close substitutes for the products; basic chemicals are the principal ingredients and cost components of systems; and the pricing of basic chemicals and systems is related such that increases in the prices of basic chemicals will raise the prices of systems. These characteristics led Dr. Beyer to conclude that a price-fixing conspiracy for polyether polyol products would have a common class-wide impact. Furthermore, he analyzed defendants' price announcements and concluded that the nature of the announcements confirmed to him that defendants perceived and intended their pricing actions to have a broad, generalized impact on all purchasers. And, his analysis of defendants'· transaction pricing data provided additional support for his opinion that the price-fixing conspiracy, if

proved, would have a generalized, class-wide impact.

Defendants, on the other hand, ask the court to discount Dr. Beyer's opinions on the ground that he does not understand the products and markets. Relying on the affidavit of their expert, Dr. Rapp, they contend that the proposed product categories are not within a single relevant market; that the availability of product substitutes varies within the proposed class; that the products at issue in this case are not undifferentiated commodities, but instead represent a range of specialized chemicals; that they do not have market power in certain market segments because of the existence of non-defendant polyether polyol suppliers and systems houses; and that, in reality, prices were not based on price lists but were individually negotiated. According to defendants, the market segments and end-use applications for MDI, TDI, polyether polyols, and systems are diverse and varied. Furthermore, they contend that pricing for MDI, TDI, and polyether polyols is individualized by customer and product.

In support of defendants' arguments, they direct the court's attention to other cases in which courts have criticized or rejected Dr. Beyer's opinions where he did not obtain a thorough and proper understanding of the product market. *See, e.g., Blue Cross & Blue Shield United v. Marshfield Clinic,* 152 F.3d 588, 593 (7th Cir.1998) (Posner, J.) (referring to Dr. Beyer's expert opinion as "worthless"); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,* 247 F.R.D. 156, 171–77 (C.D.Cal.2007) (criticizing Dr. Beyer's opinions and denying class certification). In particular, in *Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003 (10th Cir.2002), the Tenth Circuit affirmed the district court's exclusion of his testimony at trial concerning the relevant market for a monopoly claim. *Id.* at 1025–26. But, it is equally true that there are many other cases in which courts have found his opinions to be sufficient to support class certification on antitrust price-fixing claims. *See generally, e.g., In re Linerboard Antitrust Litig.,* 305 F.3d 145 (3d Cir.2002) (affirming district court's grant of class certification where the evidence, includ-

ing Dr. Beyer's opinion, was sufficient to establish antitrust impact common to the class); *In re Foundry Resins Antitrust Litig.,* 242 F.R.D. 393 (S.D.Ohio 2007) (granting motion for class certification based, in part, on Dr. Beyer's opinions); *In re Polyester Staple Antitrust Litig.,* MDL No. 3:03CV1516, 2007 WL 2111380, at *1–33 (W.D.N.C. July 19, 2007) (same); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.,* Case No. 02–6030(WHW), 2006 WL 891362, at *1–*16 (D.N.J. April 4, 2006) (same); *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251 (D.D.C.2002) (same). Thus, the court is not concerned with whether other courts have credited or discredited Dr. Beyer's opinions in other cases, but rather whether his opinions in support of plaintiffs' motion for class certification in *this* case are worthy of credence in light of the class certification record currently before the court.

The appropriate analysis begins with a recognition that defendants seeking to defeat class certification in horizontal price-fixing cases such as this one face an uphill battle. "Predominance is a test readily met in certain cases alleging ... violations of the antitrust laws," *Amchem Prods.,* 521 U.S. at 625, 117 S.Ct. 2231, because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case, 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781, at 228 (3d ed.2005). Even more specifically, it is widely recognized that the very nature of horizontal price-fixing claims are particularly well suited to class-wide treatment because of the predominance of common questions. *See, e.g., Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 105–08 (2d Cir.2007) (reversing district court's determination that common questions did not predominate the issue of impact in horizontal price-fixing case); *Cohen v. Chilcott,* 522 F.Supp.2d 105, 116 (D.D.C.2007) ("Antitrust actions involving allegations of price-fixing have frequently been found to meet the predominance requirement in class certification analyses."); *In re Foundry Resins Antitrust Litig.,* 242 F.R.D. at 409 (observing that some courts have presumed impact in these types of cases). The rationale is that "because the gravamen of a price-fixing claim is

that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695 (D.Minn. 1995); *see also In re Linerboard Antitrust Litig.*, 305 F.3d at 151 (" 'If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which ... was higher ... than the range which would have existed ... under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations ... as to the extent of [the plaintiffs] damage.' ") (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir.1977)).

Nonetheless, this rule is by no means absolute because the Courts of Appeals have at times held that class certification of horizontal price-fixing cases was not warranted. For example, in *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir.2005), the Eighth Circuit affirmed the district court's denial of class certification in a case involving an alleged conspiracy to fix prices of genetically modified soybean seeds. There, the seeds were not homogenous products, the "premium" portion of the seed could not be segregated from the rest of the seed, the seeds were not offered for sale at a uniform price, and in many instances the price of the genetically modified seeds could not be compared to anything because they had no conventional counterparts. *Id.* at 570–72. In *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir.2004), the Fifth Circuit held that the district court committed reversible error by certifying a class of automobile purchasers against automobile dealers who had charged a Vehicle Inventory Tax as a separate line item on each sales contract because the predominance requirement was not satisfied. The court held that the class impermissibly included "consumers with divergent negotiating histories" in purchasing automobiles and reasoned that in order to determine the implications of these negotiations, "a court would have to hear evidence regarding *each purported class member and his transaction*" thus destroying any alleged predomi-

nance present in the proposed class. *Id.* at 423–24 (emphasis in original). And, in *Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir.1977) (en banc), the Fourth Circuit held that the district court did not abuse its discretion in denying certification of a class of purchasers of flue-cured tobacco, which is a nonstandardized or non-fungible commodity. In that case, the Fourth Circuit affirmed the district court's decision in light of the "multiplicity of claimants" (numbering approximately 20,000), "the complexity of their claims," and the "highly individualized character the proof of injury and damages would assume." *Id.* at 66. The court noted the "staggering problems of logistics" where the issues of damages and impact do not lend themselves to mechanical calculation, but require separate mini-trials on an overwhelmingly large number of individual claims. *Id.* at 67.

With this and an abundance of other case law concerning class certification on price-fixing antitrust claims in mind, the court turns to an evaluation of the class certification record in this case to determine whether common issues, or individualized questions, will dominate the issue of antitrust impact. The pertinent legal inquiry is whether, as a result of defendants' alleged price-fixing conspiracy, the putative class plaintiffs paid a price that was artificially high because competition was removed from the market. Of course, at this procedural juncture on a motion for class certification, the plaintiffs need not prove this element. Rather, they "need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." *In re Linerboard Antitrust Litig.*, 305 F.3d at 152. In the court's evaluation of the class certification record, "[t]he operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members." *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, 2006 WL 891362, at *10. The court considers "only whether plaintiffs have made a threshold showing that what proof they offer will be sufficiently gen-

eralized in nature that ... the class action will provide a tremendous savings of time and effort." *In re Potash Antitrust Litig.*, 159 F.R.D. at 697.

The parties' arguments rely largely on their respective expert reports, each of which, not surprisingly, lend support to their respective positions. The recent trend of authority is to permit the district court to compare the relative weight of expert opinions in ruling on a motion for class certification to the extent necessary to resolve the independent question of whether the plaintiff has shown that common questions will predominate. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 231–32 (2d Cir. 2006) (affirming denial of class certification where district court weighed competing expert reports); *Blades*, 400 F.3d at 569–70 (affirming denial of class certification where the district court "considered all expert testimony offered by both sides in support of or in opposition to class certification and ... afforded that testimony such weight as [the court] deemed appropriate"). This view is grounded in the Supreme Court's directive that the court must perform a "rigorous analysis" of whether the class certification requirements of Rule 23 are met. *Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Accordingly, the court has evaluated the parties' respective expert opinions along with the other documents submitted by the parties as exhibits, all of which collectively comprise the class certification record.

Based on this record, the court is satisfied that plaintiffs have shown that they can establish their case on the element of impact by way of generalized proof as opposed to proof that is particular to each member of the class. In reaching this conclusion, the court wishes to assure defendants that the court has carefully and thoroughly reviewed the class certification record, even though the court will not discuss in this order each and every argument raised by them. Defendants argue, for example, that Dr. Beyer does not understand the polyether polyol market because, essentially, he does not view the market to be as complex as defendants believe it is. But, the factual record (other than defen-

dants' expert opinions) supports the notion that Dr. Beyer's understanding of the industry is at least reasonably accurate. Plaintiffs have directed the court's attention to an abundance of documents indicating that even the defendants themselves, along with Bayer, largely regard the basic chemicals as commodities and, furthermore, that the market is characterized by supply-side substitution. Although Dr. Rapp mentions the possibility of product substitutes in some market segments, he does not discuss any of those alleged substitutes in sufficiently meaningful detail to undermine Dr. Beyer's conclusion that they are not viable economic substitutes. Additionally, in plaintiffs' reply brief they direct the court's attention to evidence that one of the primary alleged substitute products in one application (substituting phenyl formaldehyde for PMDI as a binding agent for oriented strand board) has lost ground as a competitive substitute to PMDI because manufacturers have increasingly recognized the higher performance characteristics of PMDI. Dr. Rapp also discusses the existence of non-defendant suppliers, but only in the context of polyether polyol sales (not MDI and/or TDI, with respect to which defendants possessed 100% of the market share) and, even then, defendants still possessed 76% of the market share for polyether polyols. Defendants' arguments concerning their view of the industry does not involve individual issues that are particular to the putative class members, but rather to the nature of the industry as a whole. At this procedural juncture, the court is satisfied that Dr. Beyer's opinions are grounded in a sufficiently accurate understanding of the structure of the polyether polyol industry that the court will not disregard them.

Defendants also argue that class certification is not warranted because, they contend, pricing for the basic chemicals is highly individualized by customer and by product. It may well be that sales of the basic chemicals were characterized by individual negotiations, variations in contractual relationships, and the like. But, "the issue in the common impact analysis is the *fact*, not the amount, of injury." *In re Potash Antitrust Litig.*, 159 F.R.D. at 694 (emphasis added). Here, plaintiffs have directed this court's attention

to product price lists maintained by the defendants during the class period as well as coordinated price increase announcements from the defendants relating to the polyether polyol products. This evidence of a standardized pricing structure, which (in light of the alleged conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (observing that "sellers would not bother to fix list prices if they thought there would be no effect on transaction prices"); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382–84 (S.D.N.Y.1996) (finding that common issues predominated price-fixing claims for purchasers of list-price products, but that individual questions predominated those claims for purchasers of non-list price products; granting in part and denying in part class certification accordingly). Certainly, individualized negotiations and a diversity of prices paid do not automatically foreclose class action treatment. *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y.1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally."). Class certification is appropriate as long as the alleged antitrust violation has caused widespread injury to the class as a whole. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 321 (E.D.Mich.2001); *NASDAQ*, 169 F.R.D. at 523.[6] Here, plaintiffs have sufficiently shown that they can demonstrate such widespread injury using proof that is common to the class as a whole, as opposed to proof that is distinct to individual class members.

Defendants separately argue that the court should not certify a class that includes systems (as opposed to the basic chemicals). Their arguments in this respect are essentially twofold. First, they point out that systems are customized products that are specifically engineered to meet the performance requirements of individual customers. As such, they are not commodity products. It is clear to the court that systems are heterogenous, non-commodity, non-fungible products. They are highly specialized chemicals that clearly are not subject to class certification based on the same rationale as stated above with respect to the basic chemicals. Instead, plaintiffs argue that they intend to show class-wide impact of the conspiracy on systems purchasers by virtue of the fact that systems are made up overwhelmingly of the allegedly price-fixed basic chemicals. Certainly, there is ample authority to support such a theory. *See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d at 153–53 (conspiracy to control the output of linerboard, and therefore to raise its price, was sufficient to also encompass corrugated boxes, which are made from linerboard); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 475 (W.D.Pa.1999) (certifying a class including flat glass "and all products subsequently fabricated therefrom"). Defendants do not contest the viability of this legal theory, but instead argue that systems prices were individually negotiated and not based on list price. They further contend that the cost of the basic chemicals does not determine systems prices. Their theory in this regard is that pricing of systems is value-based instead of being based on the cost of the raw material inputs. Despite the documents produced by the defendants to support this theory, however, plaintiffs have directed the court's attention to ample internal documents from the defendants themselves demonstrating that systems prices are, at least to some extent, based on the costs of the basic chemicals that make up the systems. In addition, plaintiffs have produced documents from the defendants showing that the defendants viewed their price increase for basic chemi-

---

**6.** Defendants' argument concerning an absence of actual price increases following the announcements (which, according to defendants, demonstrates the ineffectiveness of the price increase announcements) is unavailing on class certification. Aside from the fact that this argument goes to the merits of the case and not the issue of whether plaintiffs' case concerning impact is amenable to class-wide proof, the mere fact that prices did not *increase* at the seemingly appropriate times does not conclusively establish that they were not artificially inflated so as to keep them from falling to the extent that they might have done so in a competitive market.

cals to be successful in helping them increase systems prices. And, notably, Mike Gionfriddo of plaintiff Quabaug Corporation testified in his deposition that price was "extremely important" in Quabaug's purchasing decisions. In light of this record, the court is satisfied that plaintiffs' proof that systems purchasers were impacted by the alleged price-fixing conspiracy as to basic chemicals is amenable to class-wide, as opposed to individualized, proof.

In sum, plaintiffs have shown that they can make their case that the putative class members were, in fact, injured by the alleged price-fixing conspiracy by using class-wide proof. Accordingly, the court is satisfied that common questions will predominate this element of their antitrust claim.

### 2. *Damages*

Plaintiffs contend that they can show damages using class-wide proof by using a methodology proposed by Dr. Beyer—a "before-during-after" benchmark price analysis supplemented by multiple regression. Dr. Beyer further proposes to perform separate damages calculations for purchases of products from each basic chemical category. Defendants, however, point out that Dr. Beyer's proposed methodology is unworkable given the multitude of variations in the respective positions of the putative class plaintiffs. The court is not nearly as persuaded that the issue of damages is as amenable to class-wide proof as the issues of antitrust conspiracy and impact in light of the myriad of products, pricing structures, individual negotiations, and contracts at issue. But, "even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535–36 (6th Cir.2008) (affirming district court's grant of class certification in antitrust case even though individual issues would predominate the damage inquiry). The court believes that the most likely scenario is that plaintiffs will be able to use a formulaic approach to damages through Dr. Beyer's testimony with respect to some damage calculations, but others may require individualized determinations. The possibility that individual issues may predominate the issue of damages, however, does not defeat class certification by making this aspect of the case unmanageable. The court's reasoning on this issue remains the same as that expressed in the polyester polyol cases.

> Even if individualized issues (rather than common issues) were to predominate the damage inquiry, the more appropriate course of action would be to bifurcate a damages phase and/or decertify the class as to individualized damages determinations. In other words, even if individualized issues predominate the issue of damages, the court believes that common questions nonetheless predominate in this case because common questions will govern the more difficult, threshold liability issues of proving an antitrust violation and impact.

*In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 452 (D.Kan.2006). Accordingly, the court is not persuaded that the possibility of individualized determinations regarding damages defeats the predominance of common issues on this claim as a whole.

### 3. *Fraudulent Concealment*

Defendants also argue that plaintiffs cannot prove fraudulent concealment through common proof. The court rejected a similar argument by the polyester polyol defendants. *Id.* at 452 (finding that common issues will predominate the fraudulent concealment analysis because "the key inquiry will focus on the defendants' conduct—that is, what the defendants did—rather than on the plaintiffs' conduct"). So, too, here, plaintiffs' fraudulent concealment theory rests on the defendants' conduct in issuing pretextual price increase announcements. Defendants nonetheless contend that this proof is not "common" because different members of the proposed class allegedly received different price increase announcements. They point out that purchasers received price increase announcements only from the defendants from whom they purchased products and only those announcements that pertained to the products that they purchased. Even so, the key inquiry will nevertheless still focus

on the defendants' conduct—that is, what the defendants did—in issuing pretextual price increase announcements. Thus, the court's reasoning from the polyester polyol cases applies with equal force in this set of consolidated cases. *See id.* (collecting case law on this issue).

### 4. *Conclusion Regarding Predominance and Superiority*

In sum, the court is satisfied that the key issues plaintiffs will need to prove are susceptible to common proof on a class-wide basis. These common questions will include the two issues necessary to establish liability—antitrust injury and impact—as well as defendants' alleged fraudulent concealment of the alleged price-fixing conspiracy by issuing pretextual price increase announcements. It appears that a determination of damages will be individualized, at least to some extent, and some aspects of plaintiffs' fraudulent concealment allegations may require individualized proof. Overall, however, the court is satisfied that common issues will predominate over questions affecting only individual class members. For this reason, the court believes that class resolution is superior to other available methods for the fair and efficient adjudication of this lawsuit. *See, e.g., id.* at 453 (explaining why a class action "is by far the best method for resolving the claims at issue in this lawsuit"). Accordingly, the court finds that the predominance and superiority requirements of Rule 23(b)(3) are satisfied.

### B. *Typicality*

A prerequisite for certification is that the class representatives be a part of the class and possess the same interest and suffer the same injury as class members. *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Rule 23(a)(3) requires plaintiffs to demonstrate that the claims or defenses of the class representatives are typical of the claims of the class members they seek to represent. *Rector v. City and County of Denver,* 348 F.3d 935, 949 (10th Cir.2003).

Defendants' first argument that the named plaintiffs' claims are not typical is similar to the reasons that they advanced with respect to the predominance and superiority requirement. They once again rely on their theory that the polyether polyol products are myriad compounds traded in distinct markets. They point out, for example, that many members of the proposed class did not buy the same products as other members of the proposed class. Some members bought only certain types of MDI, some bought only certain types of TDI, some bought only certain polyether polyol formulations, and some bought only customized systems. Also, not every defendant sold each of the products at issue, such as the fact that Lyondell did not sell or manufacture MDI or systems products.

▬ Defendants' argument is without merit because it is well established that "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988); *see also Anderson v. City of Albuquerque,* 690 F.2d 796, 800 (10th Cir.1982) (noting it is well established that the claims of all the class need not be identical to those of the named plaintiffs). "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 304 (E.D.Mich.2001). In this case, the named plaintiffs' claims "are typical in that they must prove a conspiracy, its effectuation, and damages therefrom-precisely what the absent class members must prove to recover." *In re Foundry Resins Antitrust Litig.,* 242 F.R.D. 393, 405 (S.D.Ohio 2007) (in the context of antitrust claims, typicality is established when the plaintiffs and all class members allege the same antitrust violations by the defendants); *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* Case No. M 02–1486, 2006 WL 1530166, at *5 (N.D.Cal. June 5, 2006) (collecting case law) (observing that "there is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members

with respect to pricing, products, and/or methods of purchasing products"). "The typicality requirement does not mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 165 (C.D.Cal.2002) (quotation omitted); *accord In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 261 (D.D.C. 2002); *see also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D.Minn.1995) ("Nor will differing damages, resulting from varied methods of procuring and purchasing the product, defeat satisfaction of Rule 23(a)(3)."); 6 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 18.9, at 30 (4th ed.2002) (noting the typicality requirement can be met "even though there were many products sold at varied prices" because typicality refers to the nature of the claim, "not to the specific facts from which it arose").

### 1. *Seegott Holdings, Inc.*

Defendants also raise more specific arguments as to why they believe each of the named plaintiffs' claims are not typical. They contend that plaintiff Seegott is atypical in at least five respects. First, it was a distributor that purchased all of its TDI, MDI, and polyether polyols during the class period from BASF. The mere fact that Seegott was a distributor does not distinguish it from the putative class plaintiffs' price-fixing claim because Seegott's claim is based on the same legal theory insofar as it was a *purchaser* of polyether polyol products during the class period. Consequently, Seegott's antitrust claim is typical of the class plaintiffs' claims because those claims are all based on the allegation that all purchasers of the polyether polyol products during the class period were injured by the defendants' alleged conspiratorial behavior. Thus, the mere fact that Seegott was also a distributor does not make its horizontal price-fixing claim atypical.

Second, defendants argue that Seegott actually benefitted in some instances from the price increases because it was paid a commis-

sion on certain sales. Defendants' theory is that the higher the product price, the higher Seegott's commission on those products. The thrust of this argument is that Seegott did not suffer as great of a net loss on its purchases because of its position in the market. But, the mere fact that Seegott may have been able to offset some of its antitrust damages with commissions does not negate its allegation that it—like the class plaintiffs—paid *some* illegal overcharges for polyether polyol products. In this respect, Seegott's price-fixing claim is entirely typical. In the seminal case of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the court expressly rejected the defendant's argument that the plaintiff could not recover for an antitrust overcharge if that party was able to pass on the overcharge to others. *Id.* at 489, 88 S.Ct. 2224. The Court explained that "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." To illustrate the point, defendants' argument on this point is based on Dr. Rapp's affidavit that Paul Seegott testified in his deposition that on some sales Seegott received a five percent commission. If one were to assume an illegal overcharge of ten cents per pound on a ten-pound purchase, Seegott would have suffered damages of one hundred dollars for that particular purchase. Even if Seegott were paid a five percent commission on the sale of that product (a $5 commission), that would not fully ameliorate the $100 overcharge. In that scenario, the mere fact that Seegott may have recouped a portion of this overcharge does not mean that its claim is atypical because Seegott, just like the other class plaintiffs, was subject to the alleged overcharge. Courts have expressly rejected similar arguments that a named plaintiff's recovery of the overcharge or potential ability to recover the overcharge defeats class certification. *See, e.g., In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, Case No. 04–5525, 2008 WL 1946848, at *6 (E.D.Pa. May 2, 2008); *J.B.D.L. Corp. v. Wyeth–Ay-*

*erst Labs., Inc.,* 225 F.R.D. 208, 216 (S.D.Ohio 2003).

Defendants' third argument that Seegott's claim is atypical rests on an exception carved out in *Hanover Shoe* where an antitrust plaintiff is able to pass on the entire overcharge to subsequent purchasers by way of cost-plus pricing. The Court observed that "there might be situations—for instance, when an overcharged buyer has a pre-existing 'costplus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. 2224. Defendants suggest that this exception applies to plaintiff Seegott based on Paul Seegott's deposition testimony concerning Seegott's ability to implement cost-plus pricing. The court has reviewed Mr. Seegott's testimony, however, and it does not establish that Seegott used pre-existing cost-plus contracts with its customers. He testified that in response to BASF's price increase announcements Seegott "tried to raise [its] prices to customers" so that Seegott would still make its margin, but if Seegott could not get that margin it would "have to walk from the business or . . . take less margin." His testimony by no means establishes that Seegott sold the allegedly price-fixed products solely on the basis of pre-existing cost-plus contracts. *See Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 217–18, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (denying application of the cost-plus contract exception where the defendant gas utility company's sales to its customers under regulations and tariffs did not amount to pre-existing cost-plus contracts).

Fourth, defendants argue that Dr. Rapp's analysis shows that Seegott's price patterns for the products it purchased are not price patterns experienced by any other customers. This argument, too, is without merit. Once again, the critical issue is not whether Seegott was harmed by the same amount as other purchasers, but whether Seegott's claims are typical because Seegott—like other polyether polyol product purchasers—was harmed by the alleged conspiratorial overcharge.

Defendants' fifth and final argument that Seegott's claims are not typical is that Seegott is subject to a counterclaim by BASF. The Courts of Appeals have held that unique defenses bear on both the typicality and adequacy of a class representative. *See Beck v. Maximus, Inc.,* 457 F.3d 291, 296 (3d Cir. 2006) (collecting cases). The challenge presented by such a defense is that the class representative's interests might not be aligned with those of the class and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class. *See id.* at 297; *see also Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992) (holding class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it). Thus, "[a] proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation." *In re Milk Prods. Antitrust Litig.,* 195 F.3d 430, 437 (8th Cir.1999).

In this case, the nature of BASF's counterclaim against Seegott gives the court some cause for concern about whether Seegott is a typical and adequate class representative. The counterclaim is for $2.4 million for Seegott's alleged non-payment pursuant to the terms of its distributor agreement with BASF. Ultimately, however, the court believes that this counterclaim does not threaten to play such a major role in this litigation that the putative class plaintiffs will suffer by Seegott devoting time and effort to defending this counterclaim at the expense of prosecuting the antitrust claim. In fact, this counterclaim is likely to play only a small role in this multidistrict litigation proceeding for several reasons. First, Seegott is not the only named plaintiff and, therefore, it would not be able to succumb to negotiating pressures because it would lack the power to unilaterally settle this case on behalf of the class plaintiffs. Second, the named plaintiffs are represented by counsel who are experienced and well versed in horizontal price-fixing antitrust litigation who have shown themselves to be motivated to obtain meaningful benefits for the putative class. Third, the $2.4 million

counterclaim is dwarfed by the scope and value of this litigation as a whole. For example, the named plaintiffs and their representatives have already obtained a $55.3 million settlement from Bayer. Moreover, one view of the impact of this counterclaim on this lawsuit is that Seegott has an even greater incentive to show that its unpaid balance is the result, at least in part, of conspiratorial overcharges in order to reduce, if not entirely eliminate, the amount that it owes to BASF. For all of these reasons, then, the court is not persuaded that this is a case where the existence of BASF's counterclaim against Seegott—even though it is a sizeable counterclaim—will in any way disadvantage the class as a whole by shifting the focus of this litigation. In sum, the court is satisfied that plaintiff Seegott's claim is sufficiently typical of those of the putative class plaintiffs.

### 2. *Industrial Polymers, Inc.*

The court turns, then, to defendants' arguments that plaintiff Industrial Polymers, Inc. does not satisfy the typicality requirement. They argue that the claim of Industrial Polymers is not typical of many class members' claims because it is an independent systems house. As an independent systems house, it purchases certain types of MDI, TDI, and polyether polyols and formulates them into systems. For some systems products, Industrial Polymers is actually a competitor with defendants, not a customer. Like plaintiff Seegott, however, Industrial Polymers' claim is typical of those of other purchasers of the basic chemicals inasmuch as it allegedly paid conspiratorially inflated prices for those products. The fact that it is a competitor of the defendants with respect to systems does not render its claim atypical simply because other class plaintiffs may have been forced to pay overcharges on systems purchases to the defendants.

Defendants also point out that Industrial Polymers did not purchase any polyols from defendants during the class period because it switched its source of supply from BASF Corp. to non-defendant Arch Chemicals because Arch provided a more consistent source of supply. Even so, however, Indus-trial Polymers purchased TDI from defendants. Therefore, it was subject to the alleged conspiratorial overcharges with respect to its TDI products. Industrial Polymers' claim involves the same legal theory and elements of proof as the claims of other purchasers of polyether polyol products. Therefore, Industrial Polymers has every incentive to prosecute this claim on behalf of the putative class plaintiffs.

Lastly, defendants seek to characterize Industrial Polymers as a "zero impact" customer. Their rationale is that the pricing for Industrial Polymers' TDI purchases appears to have been constant or declining throughout the class period. Defendants' logic is that because Industrial Polymers did not experience price increases during the class period it was not impacted by the alleged conspiracy. This argument rests on the erroneous assumption that a horizontal price-fixing plaintiff must show that the prices it paid increased or remained stable in order for a conspiracy to have existed. The critical inquiry is not whether the plaintiff's prices went up or down, but rather whether the plaintiff paid prices higher than the plaintiff would have paid in a competitive market unaffected by the alleged conspiracy. Accordingly, defendants' argument on this point is without merit. Having rejected defendants' arguments that Industrial Polymers' claim is atypical, then, the court is satisfied that its claim is typical of the class.

### 3. *Quabaug Corporation*

Defendants argue that the claim of named plaintiff Quabaug Corporation is not typical because Quabaug purchased only systems, and those systems obviously were not commodities. As explained above in the court's discussion of the predominance and superiority requirements, however, plaintiffs' claim regarding "systems" does not rest on their nature as commodity chemicals. Instead, it rests on the theory that the artificially inflated prices of the basic chemicals likewise caused the prices of systems to be artificially inflated. In this respect, then, Quabaug's claim is in fact typical of the claims of other systems purchasers.

Defendants further point out that Quabaug's prices fell or were fixed by contract during the class period. Thus, according to defendants, Quabaug is subject to "the obvious defense that it sustained no impact from the alleged conspiracy because its prices either fell in response to the alleged conspiracy or its prices were insulated from the alleged conspiracy by virtue of its contract pricing." Defendants' argument that Quabaug's prices "fell" suffers from the same flaws in logic as discussed above with respect to Industrial Polymers' prices. Simply stated, the inquiry is not whether Quabaug's prices rose or fell, but rather whether they were fixed or maintained at supracompetitive levels.

Defendants' argument that Quabaug's prices were insulated from the alleged conspiracy by virtue of its contract pricing is factually inaccurate. The class certification record establishes that Quabaug initially purchased its system from Huntsman. When Quabaug received the first price increase letter from Huntsman in January 2001, Quabaug simply refused to take the price increase. In February 2001, Quabaug began purchasing its system from Bayer at five cents per pound less than it had been purchasing from Huntsman. Quabaug's representative Michael V. Gionfriddo testified in his deposition that Quabaug sought out Bayer because the products it had been purchasing from Huntsman were not meeting its performance specifications. Until April of 2003, Quabaug made its purchases from Huntsman and Bayer on a "spot" basis. It was not until April 1, 2003, that Quabaug began purchasing a system from Bayer pursuant to a contract. This was more than three years into the class period that began on January 1, 1999. Thus, Quabaug's prices were not "insulated" (as defendants argue) from the alleged conspiracy during this entire time period, but rather were negotiated during the conspiracy up until April of 2003. Moreover, the alleged conspiracy may have impacted the contract price ultimately agreed upon between Quabaug and Bayer. Accordingly, the court rejects defendants' arguments and finds that Quabaug's claim is typical of those of the putative class plaintiffs.

### C. Adequacy of Representation

■ Rule 23(a)(4) requires that the named plaintiffs must fairly and adequately protect the interests of class members. To satisfy this prerequisite to class certification, the plaintiffs must show that their interests are aligned with those of the persons they seek to represent and that they will vigorously prosecute the class through qualified counsel. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir.2002). Defendants argue that plaintiffs Seegott and Industrial Polymers are not adequate class representatives because as a distributor and a systems house they may have actually benefitted from price increases. Defendants contend that their interests are therefore antagonistic to those of the other class members. For all of the reasons explained above, the court finds defendants' arguments in this respect to be without merit. Seegott and Industrial Polymers have the same interests as the other class members in proving that they were all damaged by defendants' alleged price-fixing conspiracy with respect to the polyether polyol products. Furthermore, the court is satisfied based on its experience to date in this multidistrict litigation proceeding that the named plaintiffs and class counsel acting on their behalf will prosecute this action vigorously on behalf of the class. Accordingly, the court finds that Rule 23(a)(4)'s adequacy of representation requirement is met in this case. Having found that the four Rule 23(a) requirements as well as the Rule 23(b)(3) requirements are met, then, the court hereby finds that certification of a class is warranted for plaintiffs' antitrust claim and related issues in this multidistrict litigation proceeding.

### III. Appointment of Counsel

An order certifying a class must also appoint class counsel that will adequately represent the interests of the class. Fed. R.Civ.P. 23(c)(1)(B), (g)(1). The court must consider the work counsel has done in identifying or investigating potential claims in the actions, counsel's experience in handling class actions and other complex litigation and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to

representing the class. Fed.R.Civ.P. 23(g)(1)(C). The court is satisfied that the law firms of Fine, Kaplan and Black, R.P.C. and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. satisfy these criteria and will adequately represent the interests of the class as lead counsel. Morris, Laing, Evans, Brock & Kennedy, Chartered shall continue to serve as liaison counsel.

## IV. *Notice*

Rule 23(c)(2)(B) provides that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The court believes that the overwhelming majority of, if not all, class members can likely be identified through reasonable efforts. To that end, defendants are directed to provide to plaintiffs the names, addresses, and telephone numbers of all customers who are potential members of the class on or before **August 29, 2008.** Also on or before **August 29, 2008,** plaintiffs shall prepare and submit to the court for approval an order regarding notice that complies with the requirements of Fed.R.Civ.P. 23(c).

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Class Certification (doc. 552) is granted.